# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MICHELLE SALDANA
on behalf of A.S.M., a minor,

       Plaintiff,

v.                                               Civ. No. 17-694  KK

NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,

       Defendant.

## MEMORANDUM OPINION AND ORDER[1]

     **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 18) filed October 17, 2017, in support of Plaintiff Michelle Saldana's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income benefits on behalf of A.S.M.  On January 25, 2018, Plaintiff filed her Motion to Reverse and Remand For Payment of Benefits, or in the Alternative, for Rehearing, With Supporting Memorandum ("Motion").  (Doc. 26.)  The Commissioner filed a Response in opposition on March16, 2018 (Doc. 28), and Plaintiff filed a Reply on April 9, 2018.  (Doc. 29.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Doc. 19.)

# I. Background and Procedural Record

Plaintiff Michelle Saldana's daughter, A.S.M. ("A.S.M."), was born on March 30, 2005, and was, therefore, at all relevant times a school-age child. (Tr. 14, 166.) On November 12, 2012, Plaintiff protectively filed an application on A.S.M.'s behalf for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. Section 1381 through 1381c, claiming that A.S.M. was disabled as of September 1, 2012, at the age of seven, because of a speech impairment. (Tr. 166, 169.) Plaintiff's application was denied at the initial level (Tr. 63, 64-71, 85-88), and at the reconsideration level (Tr. 72, 73-84, 91-94). On March 27, 2014, Plaintiff requested a hearing before an Administrative Law Judge. (Tr. 97-98.) On February 24, 2016, Administrative Law Judge Frederick Upshall, Jr., held a hearing. (Tr. 37-62.) Plaintiff and A.S.M. appeared in person at the hearing with attorney representative Michelle Baca.[2] (*Id.*) ALJ Upshall took testimony from A.S.M. (Tr. 39-41), and from Plaintiff (Tr. 45-62). In a written decision issued on June 8, 2016, ALJ Upshall found that A.S.M. was not "disabled" as that term is defined in the Social Security Act. (Tr. 8-30.) On May 23, 2017, the Appeals Council denied Plaintiff's request for review, rendering ALJ Upshall's decision the final decision of the Commissioner of the Social Security Administration (Defendant). (Tr. 1-5.) Plaintiff timely filed a complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

# II. Applicable Law

## A. Standard of Review

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir.

---

[2] Plaintiff is represented in these proceedings by Attorney Francesca J. MacDowell. (Doc. 1.)

2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). In undertaking its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency. *Langley*, 373 F.3d at 1118.

## B. Standards Governing Childhood Disability Determination

A child under the age of eighteen is considered "disabled" if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(C)(i). The Social Security Administration follows a three-step inquiry to determine whether a child is disabled. 20 C.F.R. § 416.924(a).

At step one, the ALJ must determine whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). If the child is not engaged in substantial gainful activity, the ALJ proceeds to step two. *Id.* At step two, the ALJ must determine whether the child has one or more "severe" "medically determinable impairment(s)." 20 C.F.R. § 416.924(a), (c). If so, the

ALJ proceeds to the next step. *Id.* At step three, the ALJ must determine whether the child's impairments meet, medically equal, or *functionally equal* the Listings of Impairments contained in 20 C.F.R pt. 404, subpt. P., App. 1. 20 C.F.R. § 416.924(d); *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1175 (10th Cir. 2014.).

To "functionally equal" a listed impairment, the child must have an impairment that results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The relevant domains of functioning are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b). In examining functional equivalence, the ALJ must "assess the interactive and cumulative effects of all of the [child's] impairments" including those that are not "severe" to determine how the impairments affect the child's activities—meaning everything she does at home, at school, and in the community. 20 C.F.R. § 416.926a(a), (b). The ALJ must consider how appropriately, effectively, and independently the child performs her activities as compared with children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b).

The ALJ will determine that a child has a "marked" limitation in a domain when her "impairment(s) interferes seriously with [her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.925a(e)(2)(i).

> Marked limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

*Id.*  The ALJ will find that a child has an "extreme" limitation in a domain when her "impairment(s) interferes very seriously with [her] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 417.926a(e)(3)(i).

> "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

*Id.*

Standardized test scores are a factor that an ALJ considers in determining a child's limitations in the relevant domains of functioning.  However, "[n]o single piece of information taken in isolation can establish whether" the child's limitations in a particular domain are marked or extreme.  20 C.F.R. § 416.926a(e)(4)(i).  The ALJ will consider test scores together with the other information about a child's functioning, including "reports of classroom performance and the observations of school personnel and others."  20 C.F.R. § 416.926a(e)(4)(ii).  As an example, a child may have IQ scores that are higher than two or three standard deviations below average, but if other evidence in the record shows that an impairment causes her to function in school, at home, and in the community far below her expected level of functioning, her impairment may be "marked" or "extreme" despite her IQ score.  20 C.F.R. § 416.926a(e)(4)(ii)(A).  Further, as a general rule, the ALJ should not rely on a test score as a measurement of the child's functioning within a domain when the record contains other information about the child's functioning that is typically used by medical professionals to measure day-to-day functioning. 20 C.F.R. § 416.926a(e)(4)(iii)(B).

### III. <u>Analysis</u>

The ALJ made his decision that A.S.M. was not disabled at step three of the sequential evaluation. (Tr. 16-29.) Specifically, the ALJ determined that A.S.M. had not engaged in substantial gainful activity since November 21, 2012, the application date. (Tr. 14.) He found that A.S.M. had severe impairments of speech and language delay, learning disorder, borderline intellectual functioning, unspecified neurodevelopmental disorder, and supraventricular tachycardia. (*Id.*) The ALJ determined, however, that A.S.M.'s impairments did not meet or equal in severity one the listings described in Appendix 1 of the regulations. (Tr. 15.) As a result, the ALJ proceeded to step three and found that A.S.M. did not have an impairment or combination of impairments that functionally equals the severity of the listings. (Tr. 16-29.) Specifically, the ALJ determined that A.S.M. had a marked limitation in acquiring and using information, a less than marked limitation in attending and completing tasks, a less than marked limitation in interacting and relating with others, no significant limitation in moving about and manipulating objects, no significant limitation in caring for herself, and a less than marked limitation in health and physical well-being. (*Id.*)

On appeal, Plaintiff argues that ALJ Upshall (1) erred in his determination that A.S.M. had only a marked limitation in Acquiring and Using Information; (2) erred in his determination that A.S.M. had a less than marked limitation in Attending and Completing Tasks; (3) erred in his determination that A.S.M. had a less than marked limitation in Health and Physical Well-Being; (4) erred in evaluating treating physician Joann Marie Ray, D.O.'s opinion in assessing the functional domains at issue; and (5) failed to compare A.S.M. to non-disabled children pursuant to SSR 09-2p. (Doc. 26 at 5-21.) For the reasons discussed below, the Court finds there is no reversible error.

## A. Relevant Evidence

### 1. Standardized Testing

As a second grader, A.S.M. was referred for a Multidisciplinary Evaluation through the Las Cruces Public Schools to determine aspects of her intellectual, academic, and social/emotional functioning in order to identify an appropriate educational environment for her. (Tr. 354.)  A.S.M.'s mother was concerned that A.S.M. may be dyslexic.  (*Id.*)  On October 15-16, 2012, Certified Educational Diagnostician Barbara Lewis administered several standardized tests, including the Wechsler Intelligence Scale for Children – Fourth Edition (WISC-IV); Test of Visual Perceptual Skills, 3rd Edition (TVPS-3); Comprehensive Test of Phonological Processing (CTOPP); Rapid Automatized Naming and Rapid Alternating Stimulus Tests (RAN/RAS); The Phonological Awareness Test 2 (PAT-2); and the Wechsler Individual Achievement Test – Third Edition (WIAT-III).  (Tr. 358-73.)  Ms. Lewis also reviewed Teacher Rating Forms prepared by A.S.M.'s first grade classroom teacher associated with the Behavioral & Emotional Screening Systems (BASC Screener), a test designed to determine behavioral and emotional strengths and weakness of school age children; and the Learning Disabilities Evaluation Scale, Revised Second Edition (LDES-R2), a test that measures a child's skills in the domains of listening, thinking, speaking, reading, writing, spelling, and math calculations within the classroom setting.  (Tr. 355, 358, 363-64.)  Speech-Language Pathologist Catherine S. Pitts administered other standardized tests specifically related to speech and language, including the Test of Language Development-Primary, Fourth Edition (TOLD-P-4); Clinical Evaluation of Language Fundamentals – Fourth Edition (CELF-4); and Comprehensive Assessment of Spoken Language (CASL).  (Tr. 375-81.)

On November 2, 2012, the Multidisciplinary Evaluation Team Report summarized A.S.M.'s test performance as follows:

Psycho-Educational Evaluation Report Summary:

The current evaluation indicated general cognitive ability to be in the average range with a standard score of 93; as measured by the WISC-IV VCI. [A.S.M.'s] index scores suggest that her verbal reasoning abilities are better developed than her nonverbal reasoning abilities.[3] The LDES and BASC Screeners were completed by Ms. Baca, [A.S.M.'s] first grade teacher. The results indicated that [A.S.M.] is not at-risk for a possible emotional disturbance, but is performing below her peers in all academic areas.[4] The TVPS-3 (Test of Visual Perceptual Skills, 3rd Edition) was administered to measure visual-perceptual abilities. The TVPS-3 indicated difficulty in [A.S.M.'s] visual-perceptual skills. It would be expected that she would have difficulty in reading.[5] The CTOPP (Comprehensive Test of Phonological Processing) and PAT-2 (Phonological Awareness Test 2) was administered to measure [A.S.M.'s] phonetic knowledge. She demonstrated difficulty in her vowels, digraphs, diphthongs, and in R-controlled vowels. The CTOPP results indicated Average to Below Average for [A.S.M.'s] awareness and memory of the phonemes respectively. The RAN/RAS (Rapid Automatized Naming and Rapid Alternating Stimulus Tests) was administered to measure [A.S.M.'s] rapid naming. The results indicated average performance. The WIAT-III was administered to measure [A.S.M.'s] academic achievement. The results indicated Below Average performance in reading, math, and written language. She demonstrated average abilities in her early reading skills and in solving equations. [A.S.M.] demonstrated difficulty in reading words in isolation, reading fluently, answering comprehension questions, solving word problems, writing complete sentences, and in spelling.[6]

---

[3] A.S.M.'s WISC-IV composite scores were Verbal Comprehension – 93 (Average); Perceptional Reasoning – 79 (Borderline); Working Memory – 91 (Average); Processing Speed – 106 (Average); and Full Scale IQ – 88 (Low Average). (Tr. 359.)

[4] A.S.M.'s LDES-R2 teacher ratings demonstrated a serious need for intervention in all areas – listening, thinking, speaking, reading, writing, spelling, and mathematical calculations. (Tr. 363.)

[5] A.S.M.'s TVPS-3 index scores were Overall – 76 (below average); Basic Processes – 72 (Below Average); Sequencing – 70 (Below Average); and Complex Processes – 88 (Low Average). (Tr. 361.)

[6] Reading Composite - "Using the Ability-Achievement Discrepancy Analysis and the dual discrepancy method; [A.S.M.'s] performance is 19 points discrepant from her expectancy as well as greater than 2 standard deviations from her second grade peers. [A.S.M.] does not meet criteria for a student with Dyslexia. It is recommended that [A.S.M.] receive special education services in the area of reading." (Tr. 369.)

Written Expression Composite – "Using the Ability-Achievement Discrepancy Analysis and the dual discrepancy method; [A.S.M.'s] performance is 18 points discrepant from her expectancy. She would benefit from receiving special education support in written language." (Tr. 369.)

Speech/Language Evaluation Report Summary:

[A.S.M.'s] Core Language Score of 72 on the CELF-4 places her in the "low" range of functioning; when the Standard Error of Measure of 3.0 is considered, the score range is 69-75, which is a qualifying score. The other index scores on the CELF-4 also place her greater than 2.0 standard deviations below the mean. Her index score of 64 on the Speaking Composite of the TOLD-P: 4 is 2.4 standard deviations below the mean; this provides a second qualifying score. Additionally, on the CASL, [A.S.M.] demonstrated significant difficulty on the following subtests: Antonyms: SS-72 (SEM=67-77), Syntax Construction SS-68 (2.13 standard deviations below the mean), and Pragmatic Judgment SS-73 (SEM=68.3-77.7). These scores further substantiate a pattern of difficulty with oral language skills. An informal language sample revealed that [A.S.M.'s] oral language difficulties have a mild negative impact [on] the area of conversational discourse.

(Tr. 355.) Based on A.S.M.'s test scores, she was eligible for special education as a child with a disability in the categories of reading, written language, and language. (Tr. 382-87, 388.)

On November 3, 2015, the Multidisciplinary Team reevaluated A.S.M. as a fifth grader. Their report indicated that A.S.M.'s Special Education teacher rated her current level of functioning and method of evaluation as:

| | |
|---|---|
| Reading: | Fluency: at grade level and Comprehension: 4.0 grade level; Brigance,[7] STAR,[8] and daily performance |
| Math: | 3.5 grade level; Brigance, STAR and daily performance |
| Written Language: | 3.5 grade level; writing samples |

(Tr. 680.) Ms. Lewis administered standardized tests, including the Differential Ability Scales-Second Edition;[9] and the Kaufman Test of Educational Achievement, Third Edition.[10] (Tr. 681-

---

Mathematics Composite - "Using the Ability-Achievement Discrepancy Analysis and the dual discrepancy methods; [A.S.M.'s] performance is 13 points discrepant from her expectancy and less than 2 standard deviations from her second grade peers. No significant different between [A.S.M.'s] performance and her expectancy, but it is recommended that her classroom teacher continues to provide interventions to strengthen her math skills." (Tr. 370.)

[7] BRIGANCE is a trademarked educational assessment, screening, and instructional tool. https://www.curriculumassociates.com/products/BRIGANCEoverview.aspx

[8] The STAR Reading Test is designed to gauge the reading comprehension skills and abilities of students in grades 1-12. https://study.com/academy/popular/what-is-the-star-reading-test.html.

85.)  Speech-Language Pathologist Giselle M. Gallegos administered the Clinical Evaluation of Language Fundamentals, 5th Edition.  (Tr. 691-95.)  The Multidisciplinary Team Report summarized A.S.M.'s test performance as follows:

> Psycho-Educational Evaluation Report Summary:
>
> Cognitive: [A.S.M.'s] cognitive ability was in the Low range with a standard score of 74; as measured by the DAS-II.  Based on [A.S.M.'s] previous and current cognitive it appears that her cognitive ability is not likely to be in the average range of functioning, and, therefore, learning may be challenging, as ability weaknesses constrain learning and achievement.
>
> Achievement:  [A.S.M.'s] academic achievement fell in the below average range for reading (SS=81), math (SS=75), and written language (SS=81).  She demonstrated difficulty in reading comprehension, solving equations that required regrouping, double-digit multiplication, division, fractions, solving word problems, and writing complex sentences and essay using correct capitalization and punctuation.
>
> Speech/Language Evaluation Report Summary:
>
> [A.S.M.'s] speech, intelligibility, fluency and voice were informally observed and deemed within the average range as compared to her chronological age.  The CELF 4 Observational Rating Scale indicated that [A.S.M.] was demonstrating some degree of difficulty in areas of language including listening and speaking with increased difficulty in the areas of reading and writing.  The CELF 5 yielded a Core Language Standard Score of 76 with an SEM of +/-5 yielding a range from 70-80, this placed her in the "Low Range/Moderate" range.  The Language Analysis demonstrates [A.S.M.'s] occasional difficulties in the following areas of Turn Taking, use of Nonspecific Vocabulary and Revision behaviors.  [A.S.M.'s] language deficits may continue to impact her ability to receive, process, and respond to information across curriculum areas.  Test results and teacher ratings indicate she has difficulty with comprehension, reading, and writing.  Language difficulties also significantly impact [A.S.M.'s] ability to express thoughts, ideas

---

[9] A.S.M. had composite scores of Verbal = 86 (Below Average); Nonverbal Reasoning = 66 (Very Low); Spatial = 76 (Low); Working Memory = 87 (Below Average); Processing Speed = 103 (Average; and General Conceptual Ability Composite – 74 (Low).  (Tr. 682.)

[10] A.S.M. had composite scores of Reading = 81 (Below Average); Math = 76 (Below Average); and Written Language = 81 (Below Average).  (Tr. 684.)  "All standard scores are distributed with a mean of 100 and a standard deviation of 15.  Scores that fall in the range between 85 and 115 are considered to be average."  (Tr. 683.)

and specific knowledge, and to communicate with both peers and adults in the educational setting.[11]

(Tr. 685-86.)  Based on A.S.M.'s test scores at her three-year reevaluation, she remained eligible for special education as a child with a disability in the categories of reading, written language, math, and language.  (Tr. 696-710.)

## 2. Individualized Education Programs

Individualized Education Programs ("IEPs") were prepared on A.S.M.'s behalf for second, third, fourth and fifth grades.  (Tr. 280-305, 388-403, 535-42, 696-723.)  The IEPs established annual goals in the areas of reading, written language, math and oral language, and documented A.S.M.'s progress from year to year.  (*Id.,* 260-67, 715-23.)

On December 10, 2012, A.S.M.'s first IEP set annual goals and benchmarks.  (Tr. 538-39.)  Those goals included, *inter alia*, knowing and applying grade-level phonics and word analysis skills in decoding words; reading with sufficient accuracy and fluency to support comprehension; blending and unbending most CVC words and identifying IMF sounds; demonstrating command of the conventions of standard English grammar and usage when writing (and speaking); demonstrating command of the conventions of capitalization, punctuation and spelling when writing simple sentences; working in math with time and money identification and solving of word problems; verbally produce grammatically correct complete sentences; increase correct use of descriptive vocabulary (to describe people, things, and events with relevant detail).  (*Id.*)

---

[11] A.S.M. had standard scores of Core Language = 75 (Low Range/Moderate) (1.66 Standard Deviations Below the Mean); Receptive Language Index = 70 (Very Low Range/Severe) (2.0 Standard Deviations Below the Mean); Expressive Language Index = 82 (Marginal/Below Average/Mild) (1.2 Standard Deviations Below the Mean); Language Content Index = 82 (Marginal/Below Average/Mild) (1.2 Standard Deviations Below the Mean); and Language Memory Index = 83 (Marginal/Below Average/Mild( 1.13 Standard Deviations Below the Mean).  (Tr. 692.)

On January 10, 2014, an IEP Progress Report[12] indicated that A.S.M., as a third grader, "was able to blend and unblend most CVC words and identify IMF sounds 9/10 Fry words," read most high-frequency and irregularly spelled words (180/200), and placed 3.3 on the grade placement Brigance test.  (Tr. 259.)  A.S.M. could write about one full paragraph with 60% proper grammar, punctuation, and capitalization.  (Tr. 261.)  A.S.M. scored 35% on one- and two-step word problems; 70% on adding and subtracting with regrouping; and scored 95% on multiplying and dividing with 1s, 2s, 5s and 10s, and 60% on multiplying and dividing with 3s, 4s, 6s, 7s, 8s, and 9s.  (Tr. 263.)  A.S.M. scored 71% on answering questions related to the main ideas and supporting details of a text read aloud; and produced grammatically correct sentences when given a picture cue with 100% accuracy.  (Tr. 265.)

On January 13, 2015, an IEP Progress Report[13] indicated that A.S.M.'s reading fluency, as a fourth grader, had increased with oral reading practice, but that her comprehension was behind.[14]  (Tr. 299.)  A.S.M.'s writing samples included sufficient detail, and she was nearing proficiency; however, it was noted she needed to use pre-writing organization and editing to write final drafts with fewer grammatical and spelling errors.  (Tr. 301.)  A.S.M.'s STAR Math score was at a 2.3 grade equivalence, and it was noted she had made progress with adding and subtracting with regrouping, but needed further practice with multiplication facts and with learning the correct operation to use with multi-step problems.  (Tr. 303.)  A.S.M.'s progress in language was not documented on January 13, 2015, but a March 30, 2015, report indicated that

---

[12] The Progress Report indicates that in some areas A.S.M. had made progress toward the goals, but that the goals may not be met, and instructional strategies may need to be changed.  (Tr. 259-67.)  In other areas, A.S.M. had made progress toward the goals and it appeared that the goals would be met by the next IEP review.  (*Id.*)

[13] The Progress Report indicates that in some areas A.S.M. had made progress toward the goals, but that the goals may not be met, and instructional strategies may need to be changed.  (Tr. 299-305.)  In other areas, A.S.M. had made progress toward the goals and it appeared that the goals would be met by the next IEP review.  (*Id.*)

[14] A.S.M.'s December STAR Reading Score was 2.0 grade equivalence.  (Tr. 299.)

A.S.M. scored 80% in verbal reasoning skills including sequencing, making predictions, problem solving, and inferencing. (Tr. 304.) She scored 100% on understanding and producing grammatically correct sentences using regular past tense verbs and irregular plural nouns, and 86% using irregular past tense verbs. (*Id.*) A.S.M. scored 60% in her understanding and use of synonyms or antonyms; 50% in stating synonyms of target words; 75% using context clues; 80% matching words to the appropriate definitions; and 60% using idioms. (Tr. 305.)

On November 3, 2015, as a fifth grader, A.S.M.'s IEP[15] described her present levels of academic achievement and functional performance as follows:

Reading

[A.S.M.] can read an average of 135 words per minute on grade level text. [A.S.M.] has taken 14 AR tests over books that she had read this school year and averages just 35% proficiency on them. She averages 80% proficiency over literal comprehension questions on 4th grade level passages, and 60% on 5th grade level passages. She averages around 33% on inferential questions. [A.S.M.'s] vocabulary skills are just above a 3.0 grade level.

Written Language

[A.S.M.'s] writing can be easily understood, even though it contains several errors in spelling, punctuation. She spells 4th grade words with 80% accuracy, and 5th grade words with 25% accuracy. When [A.S.M.] starts writing, she writes in complete thoughts with punctuation. However, as she continues to write and put her thoughts on paper, she stops writing in complete thoughts and creates run-on sentences containing little to no punctuation. She does a pretty good job of adding details when she wants to, but she doesn't usually like to write much and develop her thoughts. When [A.S.M.] writes narratives, she does [] not use dialogue at all to enhance and develop the story.

Math

[A.S.M.] knows around 33% of multiplication facts. She can add and subtract numbers containing decimals with a high proficiency, but she occasionally makes regrouping mistakes. She has a difficult time reading, comparing, multiplying, and dividing decimals. [A.S.M.] multiplies two multi-digit numbers containing decimals with 66% accuracy, and divides by a double-digit divisor with and without a decimal with less than 25% accuracy. [A.S.M.] can recognize a basic

---

[15] The IEP notes that A.S.M. was making appropriate progress on her IEP goals. (Tr. 702.)

fraction and add and subtract two fractions with common denominators. She simplifies fractions with less than 50% accuracy and adds and subtracts two fractions with uncommon denominators with less than 33% accuracy.

Oral Language

Updated: 11/2/2015 as per current reevaluation results on CELF-5. [A.S.M.] was administered 8 subtests, which yielded 8 subtest scaled scores. Subtest scaled scores are considered average when they fall in the range of 7-13. [A.S.M.] scored within the average range on 5 out of 8 subtest scaled scores. . . . Subtest results indicate weakness in the areas of word classes, sentence assembly, and semantic relationships. Her strengths appear to be with following word definitions and formulating sentences.

(Tr. 701-702.)

### 3. Teacher Questionnaires

Teacher Questionnaires were completed in 2013 and 2016 regarding A.S.M.'s functioning in the six domain areas.[16]

#### a. Ray Banegas, Third Grade Teacher, Six Months, 6.5 Hours/Day Monday through Friday

On February 5, 2013, Ray Banegas completed a Teacher Questionnaire on behalf of A.S.M. (Tr. 174-81.)

##### (1) Acquiring and Using Information

In the area of acquiring and using information, Mr. Banegas rated A.S.M. as having a *slight problem* in the area of understanding and participating in class discussions. (Tr. 175.) He rated A.S.M. as having an *obvious problem* in the area of providing organized oral explanations and adequate descriptions. (*Id.*) He rated A.S.M. as having *serious problems* in the areas of (1) understanding school and content vocabulary; (2) reading and comprehending written material; (3) learning new material; (4) recalling and applying previously learned material; and

---

[16] The teachers completed the questionnaires as to all six domains, but the Court will only highlight herein their assessments in the domains at issue.

(5) applying problem-solving skills in class discussions. (*Id.*) He rated A.S.M. as having *very serious problems* in the areas of (1) comprehending and doing math problems; and (2) expressing ideas in written form. (*Id.*) Mr. Banegas commented that A.S.M. needs lots of 1-1 help in the areas of reading and math. (*Id.*)

### (2) Attending and Completing Tasks

In the area of attending and completing tasks, Mr. Banegas rated A.S.M. as having *no problems* in the areas of (1) sustaining attention during play/sports activities; (2) carrying out single-step instructions; (3) waiting to take turns; (4) organizing own things or school materials; and (5) completing class/homework assignments. (Tr. 176.) He rated A.S.M. as having a *slight problem* in the area of working at a reasonable pace and finishing on time. (*Id.*) He rated A.S.M. as having *obvious problems* with (1) paying attention when spoken to directly; (2) focusing long enough to finish assigned activity or tasks; (3) refocusing to task when necessary; and (4) carrying out multi-step instructions. (*Id.*) He rated A.S.M. as having *serious problems* with (1) changing from one activity to another without being disruptive; and (2) completing work accurately without careless mistakes. (*Id.*) Finally, he rated A.S.M. as having a *very serious problem* with working without distracting self or others. (*Id.*) Mr. Banegas noted that A.S.M. needed to focus on her own tasks and not the tasks of others. (*Id.*)

### (3) Health and Physical Well-Being

In the area of health and physical well-being, Mr. Banegas noted that A.S.M. wears glasses, takes no prescribed medications on a regular basis, and that A.S.M. does not frequently miss school due to illness. (Tr. 180.)

### b.  Heather Hodges, Fourth Grade Teacher, Four Months, Daily

On December 20, 2013, Heather Hodges completed a Teacher Questionnaire on behalf of A.S.M.  (Tr. 227-34.)

### (1)  Acquiring and Using Information

In the area of acquiring and using information, Ms. Hodges rated A.S.M. as having *slight problems* in the areas of (1) understanding and participating in class discussions; and (2) recalling and applying previously learned material.  (Tr. 228.)  She rated A.S.M. as having *obvious problems* in the areas of (1) comprehending oral instructions; (2) understanding school and content vocabulary; (3) reading and comprehending written material; (4) comprehending and doing math problems; and (5) learning new material.  (*Id.*)  She rated A.S.M. as having *serious problems* in the areas of (1) providing organized oral explanations and adequate descriptions; (2) expressing ideas in written form; and (3) applying problem-solving skills in class discussions. (*Id.*)  Ms. Hodges commented that A.S.M. receives support in reading, math and written language in a pull-out, small group setting, and that in class she needs additional support.  (*Id.*) Ms. Hodges further commented that A.S.M. participates well and uses her time wisely.  (*Id.*)

### (2)  Attending and Completing Tasks

In the area of attending and completing tasks, Ms. Hodges rated A.S.M. as having *no problems* in the areas of (1) sustaining attention during play/sports activities; (2) organizing own things or school materials; (3) completing class/homework assignments; and (4) working at a reasonable pace and finishing on time.  (Tr. 229.)  She rated A.S.M. as having *slight problems* in the areas of (1) paying attention when spoken to directly; (2) focusing long enough to finish assigned activity or tasks; (3) refocusing to task when necessary; (4) carrying out single-step instructions; (5) waiting to take turns; (6) completing work accurately without careless mistakes;

and (7) working without distracting self or others.  (*Id.*)  She rated A.S.M. as having *obvious problems* with (1) carrying out multi-step instructions; and (2) changing from one activity to another without being disruptive.  (*Id.*)

### (3)  Health and Physical Well-Being

In the area of health and physical well-being, Ms. Hodges noted that A.S.M. has a heart condition (irregular heart beat), but had not exhibited any physical effects to her knowledge.  (Tr. 233.)  She noted that A.S.M. wears glasses, takes prescribed medication on a regular basis, and that A.S.M. does not frequently miss school due to illness.  (Tr. 233.)

### c.  Thomas Banks, Special Education, Fifth Grade, Six Months, Two Hours Daily

On January 31, 2016, Thomas Banks completed a Teacher Questionnaire on behalf of A.S.M.  (Tr. 332-39.)

### (1)  Acquiring and Using Information

In the area of acquiring and using information, Mr. Banks rated A.S.M. as having *slight problems* with (1) expressing ideas in written form; and (2) applying problem-solving skills in class discussions.  (Tr. 333.)  He rated A.S.M. as having *obvious problems* in the areas of (1) comprehending oral instructions; (2) understanding school and content vocabulary; (3) understanding and participating in class discussions; (4) providing organized oral explanations and adequate descriptions; (5) learning new material; and (6) recalling and applying previously learned material.  (*Id.*)  He rated A.S.M. as having *serious problems* in the areas of (1) reading and comprehending written material; and (2) comprehending and doing math problems.  (*Id.*)  Mr. Banks commented that A.S.M. reads fluently at or even above grade level, but really struggles with comprehension.  (*Id.*)

### (2)     Attending and Completing Tasks

In the area of attending and completing tasks, Mr. Banks rated A.S.M. as having *slight problems* in the area of organizing her own things or school materials. (Tr. 334.) He rated A.S.M. as having *obvious problems* in (1) focusing long enough to finish assigned activity or tasks; (2) refocusing to task when necessary; (3) carrying out single-step instructions; (4) carrying out multi-step instructions; (5) waiting to take turns; (6) changing from one activity to another without being disruptive; (7) completing class/homework assignments; (8) completing work accurately without careless mistakes; and (9) working at a reasonable pace and finishing on time. (*Id.*) He rated A.S.M. as having *serious problems* in the areas of (1) paying attention when spoken to directly; and (2) working without districting self or others. (*Id.*) Mr. Banks commented that A.S.M. has a very hard time listening and not talking out during instruction. (*Id.*)

### (3)     Health and Physical Well-Being

In the area of health and physical well-being, Mr. Banks indicated that A.S.M. does not frequently miss school due to illness. (Tr. 338.)

### d.     Heather Hinde, Fifth Grade Teacher, Two Years, Daily

On February 1, 2016, Heather Hinde completed a Teacher Questionnaire on behalf of A.S.M. (Tr. 316-23.)

### (1)     Acquiring and Using Information

In the area of acquiring and using information, Ms. Hinde rated A.S.M. as having *no problems* in the area of comprehending oral instructions. (Tr. 317.) Ms. Hinde rated A.S.M. as having *obvious problems* in the areas of (1) learning new material; (2) recalling and applying previously learned material; and (3) applying problem-solving skills in class discussions. (*Id.*)

She rated A.S.M. as having *serious problems* in the areas of (1) understanding school and content vocabulary; (2) comprehending and doing math problems; (3) providing organized oral explanations and adequate descriptions; and (4) expressing ideas in written form. (*Id.*) Ms. Hinde rated A.S.M. as having *very serious problems* in the areas of (1) reading and comprehending written materials; and (2) understanding and participating in class discussions. (*Id.*) Ms. Hinde commented that A.S.M. has problems understanding vocabulary and new reading and math concepts. (*Id.*)

### (2)  Attending and Completing Tasks

In the area of attending and completing tasks, Ms. Hinde rated A.S.M. as having *no problems* in the areas of (1) paying attention when spoken to directly; (2) carrying out single-step instructions; (3) waiting to take turns; (4) organizing own things or school materials; (5) completing class/homework assignments; and (6) completing work accurately without careless mistakes. (Tr. 318.) She rated A.S.M. as having *slight problems* in the areas of (1) sustaining attention during play/sports activities; (2) refocusing to task when necessary; (3) carrying out multi-step instructions; (4) working without distracting self or others; and (5) working at a reasonable pace and finishing on time. (*Id.*) She rated A.S.M. as having *obvious problems* in the areas of (1) focusing long enough to finish assigned activity or tasks; and (2) changing from one activity to another without being disruptive. (*Id.*)

### (3)  Health and Physical Well-Being

In the area of health and physical well-being, Ms. Hinde noted that there were no physical effects related to any medical condition that interfered with A.S.M.'s functioning at school. (Tr. 322.) She also noted that A.S.M. wears glasses and does not frequently miss school due to illness. (*Id.*)

### e.  Giselle Gallegos, Speech-Language, Fifth Grade, Five to Six Months, 1x/wk. for 30 Minutes

On February 1, 2016, Speech-Language Pathologist Gisselle Gallegos completed a Teacher Questionnaire on behalf of A.S.M.  (Tr. 324-31.)

### (1)  Acquiring and Using Information

In the area of acquiring and using information, Ms. Gallegos rated A.S.M. as having *obvious problems* in the areas of (1) comprehending oral instructions; (2) understanding school and content vocabulary; (3) reading and comprehending written material; (4) understanding and participating in class discussions; (5) providing organized oral explanations and adequate descriptions; (6) learning new material; (7) recalling and applying previously learned material; and (8) applying problem-solving skills in class discussions.  (Tr. 325.)  Ms. Gallegos commented that A.S.M. has difficulty processing information and benefits greatly from repeated information presented with a visual aid.  (*Id.*)  She further commented that A.S.M. comprehends better if longer information is presented in shorter blocks of information.  (*Id.*)

### (2)  Attending and Completing Tasks

In the area of attending and completing tasks, Ms. Gallegos rated A.S.M. as having *slights problems* in the areas of (1) paying attention when spoken to directly; (2) carrying out single-step instructions; (3) waiting to take turns; (4) changing from one activity to another without being disruptive; and (5) working without distracting self or others.  (Tr. 326.)  She rated A.S.M. as having *obvious problems* in the areas of (1) refocusing to task when necessary; and (2) carrying out multi-step instructions.  (*Id.*)  She commented that A.S.M. has ongoing difficulties, but was able to engage well and was successful with minimal and moderate support for age level tasks.  (*Id.*)

### (3)    Health and Physical Well-Being

In the area of health and physical well-being, Ms. Hinde noted A.S.M. does not frequently miss school due to illness.  (Tr. 330.)

### 4.    Noah K. Kaufman, Ph.D. , FACPN, ABPdN

On December 11, 2013, A.S.M. presented to Noah K., Kaufman, Ph.D., based on a referral from A.S.M.'s treating physician Joann Ray, D.O.  (Tr. 544.)  The problems noted were difficulty completing homework, inability to consistently follow through on instructions and complete tasks, a tendency to be easily distracted, arguing with adults, and placement in special education with language and specific learning difficulties.  (*Id.*)

Dr. Kaufman took histories from A.S.M.'s mother; *i.e.,* development, education, disability, legal, medical, family, social and recreational.  (Tr. 545-46.)  Dr. Kaufman reviewed the Initial Psycho-Educational Report prepared by the Las Cruces Public Schools.  (Tr. 546-47.)  Dr. Kaufman observed, *inter alia*, that A.S.M. was friendly, cooperative, polite, and came across as largely untroubled, both emotionally and behaviorally.  (Tr. 547-48.)  He noted that A.S.M.'s basic orientation and awareness seemed questionable because she was unable to answer certain questions regarding the country or state in which she lived, the current year or U.S. president, the five main senses, how many world wars there had been, or what happened on 9/11/2001.  (Tr. 547.)

Dr. Kaufman administered a number of standardized tests, including the WISC-IV and WIAT-III.  (Tr. 548-53.)  Based on all of the test results and his observations, and noting that some of the scores in his report might be a slight underestimate of A.S.M.'s actual ability, Dr. Kaufman raised the possibility that A.S.M.'s neurocognitive challenges "may in fact be substantial," and "[n]ot just a learning disorder or two."  (Tr. 556.)  Dr. Kaufman specifically

discussed his finding of a Full-Scale IQ of 66, which he characterized as a "huge difference" from the school's reported Full-Scale IQ of 88. (Tr. 551.) Dr. Kaufman stated he was "inclined to raise the possibility that [A.S.M.] *may have* Intellectual Disability (ID)," but declined to do so because of the potential threats to score validity, because A.S.M.'s mother had not reported extremely low adaptive functioning, and because the IQ score was so discrepant from what the school reported. (Tr. 556.) Dr. Kaufman stated that A.S.M.'s "parents should take [his] findings 'with a grain of salt,'" and should do likewise with the school's results. (Tr. 557.) He stated that retesting "over the next decade or so" would reveal which IQ estimate was more accurate, but that in the meantime A.S.M.'s parents should continue getting the support A.S.M. needed and then look to see what information replicates over time. (Tr. 557.) Finally, Dr. Kaufman discussed the concept of a "halo effect," and explained that because A.S.M. was pretty, friendly, and smiles, that her neurocognitive status may appear more normal than it actually is. (Tr. 556-57.)

Dr. Kaufman's Axis I diagnoses included unspecified neurodevelopment disorder, borderline intellectual functioning, obesity, rule out (or in) low income, rule out (or in) academic problem, rule out (or in) intellectual disability, rule out (or in) overeating, and rule out (or in) problems related to lifestyle. (Tr. 557-58.)

On March 11, 2014, Dr. Kaufman prepared a "To Whom It May Concern" letter on A.S.M.'s behalf after learning her application for SSI had been denied. (Tr. 725.) He stated therein that the numbers in his report painted a "cogent picture of substantial neurodevelopmental deficits" and that A.S.M.'s numbers were extremely low. (*Id.*)

5.    **Joann Marie Ray, D.O.**

A.S.M. saw Joann Marie Ray, D.O., five times between 2013 and 2016 - three times in 2013, once in 2014, and once in 2016.  (Tr. 479-81, 482-85, 486-88, 572, 727-28.)  Two of the visits were for acute care related to bronchitis and asthma.  (Tr. 482-85, 486-88.)  On May 6, 2013, at the request of A.S.M.'s mother, Dr. Ray reviewed A.S.M.'s 2012 IEP and denial of SSI.  (Tr. 479-81.)  Dr. Ray explained to A.S.M.'s mother that a "mild learning disorder with a good IQ would not qualify [A.S.M.] for SSI, [and] that with Special Ed services [A.S.M.] should be able to keep up with her peers."  (Tr. 480.)   On January 2, 2014, Dr. Ray went over Dr. Kaufman's report with A.S.M.'s mother.  (Tr. 572.)  Based on Dr. Kaufman's report and the most recent IEP, and focusing on Dr. Kaufman's Full-Scale IQ score of 66 and his halo effect theory, Dr. Ray now said she agreed with A.S.M.'s mother to seek SSI benefits.  (*Id.*)   On February 8, 2016, Dr. Ray went over A.S.M.'s recent diagnostic evaluations and 2015 IEP.  (Tr. 727-78.)  Dr. Ray noted that

> [t]he school's first eval is dated 10/16/2012 (more than three years ago).  Her IQ was found to be in the low normal range at 88.  She was seen by Dr. Kaufman, neuropsychologist, on 12/11/2013.  He found her IQ to be 66 and, in his note, expressed surprise at the discrepancy between his test and that of the school.  He said his findings were not consistent with any learning disorder and remarked on the "Halo" effect – that the patient was flying under the radar by the schools because she is cute and doesn't cause trouble.  He recommended a re-check this year to check for further brain growth and possible increase in her IQ.  The school's IEP dated 11/13/2015 [sic] stated that patient's standardized test scores show little progress in reading and math; she tested at 1.5 grade level in reading and 2.4 grade level in math.  It cited a DAS-II test result of cognitive ability in the low range with a score of 74.  I believe her school testing fails to admit that patient has at best a borderline intelligence and because of this can't progress in a meaningful fashion, despite the intensive pull-out schooling she receives in Special Ed.  (Of particular interest to me are the comments on lack of basic awareness testing by Dr. Kaufman stated on pages 12 and 13 of his report.)  I believe SSI benefits will allow her Mom to provide tutoring and possibly assisted learning devices that can at least keep her from falling farther behind.  She is going to need significant attention as her schooling becomes more involved and

with higher social expectation. (I recommend a re-eval by Dr. Kaufman at the end of this year as well. My instinct is that it won't change much, if at all.)

(Tr. 728.)

6. **Jeffrey Schuster, M.D., FACC, FAAP**

On June 5, 2013, A.S.M. presented to Pediatric Cardiologist Jeffrey Schuster, M.D., FACC, FAAP, on a referral from Dr. Ray due to an irregular heartbeat. (Tr. 466-67.) A.S.M.'s parents reported that A.S.M.'s irregular heartbeat had been present since age 3 and that a recent ECG showed an arrhythmia. (Tr. 466.) A.S.M.'s parents stated that A.S.M. appeared normal, and that the irregular heartbeat had caused no concerns and was not restricting A.S.M.'s activity. (*Id.*) On physical exam, Dr. Schuster noted that A.S.M.'s heart sound was very irregular. (*Id.*) Dr. Schuster administered an ECG and Echocardiogram. (Tr. 467.) The ECG showed premature atrial complexes, which he noted are usually benign. (*Id.*) The Echo showed normal heart anatomy and function, with frequent ectopic (irregular) heartbeats. (*Id.*) Dr. Schuster placed a 24 hour Holter monitor to assess how much ectopy A.S.M. was having. (*Id.*) He indicated that no cardiovascular restrictions were necessary, and instructed A.S.M. to return in one month. (*Id.*)

On July 10, 2013, A.S.M. returned for follow up. (Tr. 468-69.) Dr. Schuster noted no complaints of palpitations or chest pain. (Tr. 468.) A.S.M. did complain of right knee pain. (*Id.*) Dr. Schuster noted that the Holter monitor demonstrated 44% ectopy with a lot of bigeminy.[17] Dr. Schuster's impression was that A.S.M. was having premature atrial complexes and short runs of supraventricular tachycardia. (Tr. 469.) He noted that "[s]he doesn't feel it and it does not apparently affect her. However, I wonder if she would be better off without it." (*Id.*) He prescribed 25 mg. Atenolol to see if it made a difference. (*Id.*) He noted that if it did, then

_____

[17] A normal heartbeat that is followed by a beat that arrives too quickly. https://www.healthline.com/health/bigeminy.

ablation of her atrial focus could be considered. (*Id.*) A.S.M. was instructed to return in three weeks. (*Id.*)

On August 14, 2013, A.S.M. saw Dr. Schuster for follow up. (Tr. 470-71.) Dr. Schuster noted no complaints of palpitations or chest pain. (Tr. 470.) A.S.M. continued to complain of right knee pain and reported that she enjoyed playing kickball with her friends. (*Id.*) Dr. Schuster noted that the Holter monitor demonstrated 27% atrial ectopy, down from 43%. (Tr. 471.) He planned to increase the Atenolol to 25 mg. twice a day. (*Id.*) Dr. Schuster indicated that no cardiovascular restrictions were necessary. (*Id.*)

On October 16, 2013, A.S.M. returned to see Dr. Schuster. (Tr. 472-73.) She was no longer complaining of right knee pain. (Tr. 472.) Dr. Schuster noted that A.S.M. had tolerated the increased dose of Atenolol well, but that he still heard some ectopics. (Tr. 473.) He planned to place a Holter monitor and to have her see the pediatric electrophysiologist when he came to El Paso. (*Id.*) Dr. Schuster indicated that no cardiovascular restrictions were necessary. (*Id.*)

On December 18, 2013, A.S.M. followed up with Dr. Schuster. (Tr. 494-95.) A.S.M. complained of left leg thigh pain that was not related to medications or cardiovascular symptoms. (Tr. 494.) A.S.M. reported she was taking only one dose of Atenolol each day. (*Id.*) Dr. Schuster noted that the Holter monitor showed frequent premature atrial complexes, and short runs of supraventricular tachycardia which should not cause any problems. (*Id.*) Dr. Schuster instructed A.S.M. to take the Atenolol twice a day. (*Id.*) Dr. Schuster indicated that no cardiovascular restrictions were necessary. (*Id.*)

On May 30, 2014, A.S.M. returned to see Dr. Schuster and had no complaints. (Tr. 629-30.) Dr. Schuster noted that the ECG showed "normal sinus rhythm with premature atrial beats and a 3 beat run of atrial tachycardia." (Tr. 630.) Dr. Schuster noted that A.S.M. was

asymptomatic, and was not seeing much response to Atenolol. (*Id.*) Dr. Schuster also noted that A.S.M. had seen an electrophysiologist, with whom her parents discussed ablation in depth. (*Id.*) Dr. Schuster indicated that because A.S.M. was having so much ectopy, ablation was recommended. (*Id.*) He planned to check with her Medicaid carrier and see if it could be arranged. (*Id.*) In the meantime, Dr. Schuster indicated that no cardiovascular restrictions were necessary. (*Id.*)

On September 29, 2014, A.S.M. saw Dr. Schuster in follow up. (Tr. 664-65.) A.S.M. reported doing well, and having no cardiovascular symptoms or problems with the medication. (Tr. 664.) A.S.M. reported occasional headaches. (*Id.*) Dr. Schuster's impression was that A.S.M. was asymptomatic and doing well at Atenolol. (*Id.*) He noted that A.S.M.'s parents had decided to postpone the ablation procedure and to continue on medicinal therapy. (Tr. 665.) Dr. Schuster noted that "[d]ecreased cardiac function would be an absolute indication for intervention." (*Id.*) Dr. Schuster placed a Holter monitor, instructed A.S.M. to continue her medication and to follow up in six months, and indicated that no cardiovascular restrictions were necessary. (*Id.*)

On March 23, 2015, A.S.M. saw Dr. Schuster in follow up. (Tr. 670-71.) A.S.M. reported doing well, and having no cardiovascular symptoms or problems with the medication. (Tr. 670.) She reported occasional headaches. (*Id.*) An ECG demonstrated frequent premature atrial complexes. (Tr. 671.) Dr. Schuster's impression was that A.S.M. was asymptomatic and that her last Holter did not show any sustained tachycardia. (*Id.*) He instructed her to remain on the Atenolol twice a day and to follow up in six months. (*Id.*) He indicated that no cardiovascular restrictions were necessary. (*Id.*)

On February 24, 2016, PA-C Elizabeth Telles, from Dr. Schuster's practice, prepared a "To Whom It May Concern" letter stating that A.S.M. was under Dr. Schuster's care for a diagnosis of atrial ectopic tachycardia. (Tr. 730.) The letter indicated that A.S.M. was taking medication and was clinically stable. (*Id.*)

## B. The ALJ's Findings Are Supported by Substantial Evidence

### 1. Acquiring and Using Information

At the third step of the analysis, ALJ Upshall found that A.S.M. had a marked limitation in the domain of acquiring and using information. (Tr. 21-23.) Plaintiff argues that the evidence supports an extreme limitation. (Doc. 26 at 6-10.) In support, Plaintiff cites the LDES teacher ratings from A.S.M.'s 2012 standardized testing to argue that A.S.M. was performing three standard deviations below the mean in areas of listening, thinking, speaking, reading, writing, spelling, and mathematical calculations. (Doc. 26 at 6.) Plaintiff cites Dr. Kaufman's report and his follow-up "To Whom It May Concern Letter"; Ms. Hinde's Teacher Questionnaire wherein she indicated very serious problems in two activities, along with serious problems in four activities; and 2015 standardized testing demonstrating that A.S.M.'s general conceptual ability composite was low (74). (*Id.* at 6-8.) Plaintiff also cites certain fourth grade reading scores to argue that A.S.M.'s cognitive functioning was more than two standard deviations below the mean, and states that by the fifth grade A.S.M. was functioning three grade levels below in reading, giving rise to a serious interference with her ability to read and affecting her overall ability to learn. (*Id.*) Plaintiff further asserts that A.S.M.'s treating physician, Dr. Ray, agreed with Dr. Kaufman's report and noted that A.S.M. was at best borderline intelligence and could not progress in a meaningful fashion despite the intensive pull-out schooling she received in Special Education. (*Id.*)

The Commissioner contends that the ALJ's decision demonstrates that he reviewed all of the evidence, including Plaintiff's statements regarding A.S.M.'s impairments, her school records and teachers' reports, and the medical source opinions of record. (Doc. 28 at 8-10.) The Commissioner further contends that the ALJ's finding was reasonable, well-explained, and supported by the record, and that Plaintiff's claims that the ALJ should have instead found an extreme limitation in this domain amounts to asking the Court to re-weigh the evidence. (*Id.*)

The functional domain of "acquiring and using information" considers how well a child acquires or learns information and how well she uses the information she has learned. 20 C.F.R. § 416.926a(g). The regulations provide the following age group descriptors for school age children:

> When you are old enough to go to elementary and middle school, you should be able to write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; *e.g.,* by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (*e.g.,* reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv). Additionally, the regulations provide the following examples of limited functioning in acquiring and using information:

(i)     You do not demonstrate understanding of words about space, size, or time; *e.g,* in/under, big/little, morning/night.

(ii)    You cannot rhyme words or the sounds in words.

(iii)   You have difficulty recalling important things you learned in school yesterday.

(iv)    You have difficulty solving mathematics questions or computing arithmetic answers.

(v)     You talk only in short, simple sentences and have difficulty explaining what you mean.

20 C.F.R. § 416.926a(g)(3)(i)-(v).

The Court finds that the ALJ properly considered all of the evidence, and that his finding that A.S.M. has a marked limitation in acquiring and using information is supported by substantial evidence. *See* 20 C.F.R. § 416.924a (explaining the considerations in determining disability for children); *see also* 20 C.F.R. § 416.926a (explaining how functional equivalence is determined). In support of his assessment, the ALJ considered and discussed A.S.M.'s standardized test scores as he was required to do, 20 C.F.R. § 416.924a(a)(1)(ii), and determined that the scores did not support a disabling limitation. (Tr. 17.) In so doing, he specifically noted that the 2012 LDES demonstrated that A.S.M. was in serious need of intervention in the areas of listening, thinking, reading, writing and spelling,[18] and that the WAIT-III showed that A.S.M. was functioning in the below average range in math, reading, and written language. (*Id.*) He also noted, however, that the WISC-IV intelligence test showed a full scale IQ of 88.[19] The record supports these findings. *See* Section III.A.1., *supra*. The ALJ discussed that A.S.M.'s 2015 standardized test scores demonstrated ongoing learning problems, that her core language scores ranged from mildly below average to severely low, and that her KTEA-3 academic achievement test showed that A.S.M. was functioning below average in the areas of reading,

---

[18] The LDES measures a child's skills in the domains of listening, thinking, speaking, reading, writing, spelling, and mathematical calculations within the classroom as observed and rated by a classroom teacher. (Tr. 363.) A.S.M.'s first grade teacher, Ms. Baca, rated A.S.M. in each of these areas. (Tr. 355.) Plaintiff argues that A.S.M.'s LDES scores were more than three standard deviations below the mean. (Doc. 26 at 6.) Contrary to Plaintiff's argument however, the test analysis does not indicate mean scores or what represents a standard deviation of the mean. (Tr. 363.) And the Court will not assume facts that are not in the record. Instead, the test analysis demonstrated that A.S.M. was in serious need of intervention in each of the domains. (*Id.*) The ALJ discussed this in his analysis. (Tr. 17.)

[19] In the context of evaluating A.S.M.'s impairments under Listing 112.05D, the ALJ discussed Dr. Kaufman's WISC-IV Full Scale IQ of 66, and that Dr. Kaufman questioned the validity of this IQ score. (Tr. 15.)

math and written language. (Tr. 18.) The record supports these findings. *See* Section III.A.1., *supra*. The record also supports that where standard deviations below the mean were included in A.S.M.'s standardized test scores, they were all less than three,[20] providing support for a marked, as opposed to extreme, limitation.[21] 20 C.F.R. § 416.926a(e)(2)(i).

The ALJ considered and discussed the medical source evidence. 20 C.F.R. § 416.924a(a)(1)(iii). The ALJ discussed Dr. Kaufman's findings which noted neurodevelopmental deficits, and found that to the extent Dr. Kaufman's statement reinforced that A.S.M. had significant problems in the area of acquiring and using information, it was consistent with other evidence in the record. (Tr. 21.) Elsewhere in his determination, the ALJ discussed Dr. Kaufman's WISC-IV Full Scale IQ of 66, and that Dr. Kaufman questioned the validity of this IQ score.[22] (Tr. 15.) The record supports this finding. (Tr. 556-57.) The ALJ discussed the State agency medical consultant opinion evidence that supported marked limitations in this domain.[23] (Tr. 20.) Finally, the ALJ discussed Dr. Ray's January 20, 2014, treatment note in which she stated she agreed with Plaintiff's seeking of SSI benefits, which the

---

[20] The November 2012 WIAT-III demonstrated that A.S.M.'s Reading Composite was greater than 2.0 standard deviations below the mean. (Tr. 369.) Certain of A.S.M.'s November 2012 CELF-4 and CASL scores placed her at 2.0, 2.13 and 2.4 standard deviations below the mean. (Tr. 355.) A.S.M.'s November 2015 KTED-3 reading scores placed her at less than 2 standard deviations below the mean. (Tr. 683.) A.S.M.'s November 2015 CELF-5 scores placed her at 1.66, 2.0, 1.2, 1.2 and 1.13 standard deviations below the mean in Core Language, Receptive Language Index, Expressive Language Index, Language Content Index, and Language Memory Index, respectively. (Tr. 692.)

[21] *See* fn. 18, *supra*.

[22] Plaintiff has not raised any issues regarding the ALJ's evaluation of Dr. Kaufman's report or his March 2014 statement.

[23] On April 11, 2013, State agency consultants C.J. Feng, MS CCC SLP, Jon M. Aase, M.D., and Cathy Simutis, Ph.D., assessed that A.S.M. had a marked limitation in Acquiring and Using Information. (Tr. 67.) On February 25, 2014, at reconsideration, State agency consultants Alvin Smith, Ph.D., Eileen M. Brady, M.D., and Scott R. Walker, M.D., assessed that A.S.M. had a marked limitation in the domain of Acquiring and Using Information. (Tr. 80.) The ALJ accorded their opinions great weight. (Tr. 20.) Plaintiff has not disputed the ALJ's evaluation or weighing of the State agency medical consultant opinions.

ALJ determined was vague and failed to address A.S.M.'s abilities in terms of the relevant functional domains.[24] (Tr. 21.)

The ALJ considered and discussed information provided by Plaintiff about A.S.M. 20 C.F.R. § 416.924a(a)(2)(i). For example, the ALJ stated that in her December 2013 Function Report, Plaintiff did not report any significant problems in A.S.M.'s self-care abilities or in interacting and relating with others.[25] (Tr. 15.) The ALJ noted that Plaintiff did not report extremely low functioning to Dr. Kaufman. (*Id.*) The record supports these findings. (Tr. 156-65, 556.) Finally, the ALJ noted that Plaintiff testified at the administrative hearing regarding A.S.M.'s problems with school.[26] (Tr. 16-17.)

The ALJ considered and discussed information from A.S.M.'s school, including her Individualized Education Programs, her Grade 4 Assessment Report, and multiple Teacher Questionnaires. (Tr. 22.) In particular, the ALJ noted that the December 2013 IEP indicated that A.S.M. continued to have significant difficulty with mathematics, writing and language concepts, and understanding what she reads, and required special education in reading, writing, math, and

---

[24] Plaintiff argues that the ALJ erred in assessing Dr. Ray's opinion. (Doc. 26 a 19-20.) The Court will address that issue in turn.

[25] On November 28, 2013, Plaintiff completed a Function Report on behalf of A.S.M. (Tr. 156-65.) She reported that A.S.M. could deliver telephone messages, repeat stories she had heard, explain why she did something, use sentences with "because," "what if," and "should have been," and talk with family and friends. (Tr. 159.) A.S.M. could read capital and small letters of the alphabet, read simple words, print some letters, print her name, and spell most 3-4 letter words. (Tr. 160.) She could not read and understand simple sentences, read and understand stories in books or magazines, write in cursive, write a simple story with 6-7 sentences, add and subtract numbers over 10, know days of the week and months of the year, understand money, or tell time. (*Id.*) A.S.M. had friends her own age, could make new friends, and generally got along with mother, other adults, and with school teachers. (Tr. 162.) A.S.M. uses zippers, buttons clothes, ties shoelaces, takes a bath or shower without help, brushes teeth, combs or brushes her hair, washes her hair, picks up and puts away toys, helps around the house, does as she is told most of the time, and gets to school on time. (Tr. 163.) A.S.M. does not choose clothes by herself, does not eat by herself using knife, fork, and spoon, does not hang up clothes, does not obey safety rules, and does not accept criticism or correction. (*Id.*) A.S.M. keeps busy on her own, completes homework, and completes chores most of the time. (Tr. 164.) A.S.M. cannot finish things she starts; works on arts and crafts projects. (*Id.*)

[26] Plaintiff testified that A.S.M. has a hard time understanding, especially school work, and that A.S.M. needs help with homework. (Tr. 46.) Plaintiff testified that they read every night, and that A.S.M. was doing a lot better on reading. (Tr. 47.) Plaintiff also testified that A.S.M. struggled with school. (*Id.*)

speech-language therapy. (Tr. 17.) The ALJ discussed that school records demonstrated that A.S.M. continued to have problems in the 2014-2015 school year, and that she continued to perform below grade level in reading, writing and math. (Tr. 18.) The ALJ also noted however, that by the end of the school year, A.S.M. had made some progress in mathematics and reading, and that her writing skills had shown overall improvement. (*Id.*) The ALJ discussed that the November 2015 IEP indicated that A.S.M.'s reading fluency was at grade level, her reading comprehension was on the fourth grade level, and her math and written language skills were on the 3.5 grade level, but that her teacher had indicated she had poor to average study skills. (*Id.*) The record supports these findings. *See* Section III.A.2., *supra*. As for the Teacher Questionnaires, the ALJ discussed and compared the domain ratings of A.S.M.'s teachers from 2013 and from 2016 in the area of acquiring and using information. (Tr. 22-23.) The ALJ found that "[t]o the extent the teachers' questionnaires reflect a number of serious or very serious limitations in acquiring and using information, they are largely consistent with each other. Moreover, they are based on the teachers' longitudinally-significant observations." (Tr. 23.) The record supports this finding.[27] *See* Section III.A.3., *supra*.

Plaintiff essentially asks this Court to reweigh the evidence, which it cannot do. *See Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir 2007) ("We review only the sufficiency of the evidence, not its weight . . . . Although the evidence may also have supported contrary findings, we may not displace the agency's choice between two fairly conflicting views[.]"). Here, the ALJ demonstrated he considered all the evidence, even though he may not have discussed every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)

---

[27] Five teachers completed Teacher Questionnaires – two in 2013 and three in 2016. (Tr. 175, 228, 317, 325, 333.) The teachers were asked to rate A.S.M.'s functioning in 10 different activities related to acquiring and using information. Although their ratings varied for the respective activities, of the 50 cumulative teacher ratings (5 x 10 = 50), there were 3 blank ratings, 1 no problem rating, 5 slight problem ratings, 23 obvious problem ratings, 14 serious problem ratings, and 4 very serious problem ratings. (*Id.*)

(explaining that the record must demonstrate that the ALJ considered all of the evidenced, but an ALJ is not required to discuss every piece of evidence). Of note, in determining that the evidence supported a marked limitation, the ALJ did discuss and rely on, much of the evidence Plaintiff has cited to the Court. Because the Court finds that the ALJ's decision is supported by substantial evidence, and because Plaintiff's argument goes to the weight of the evidence and not its sufficiency, the Court will not displace the ALJ's decision.

For the foregoing reasons, the Court finds that the ALJ considered and discussed the evidence for childhood disability as required, considered the regulatory standards for assessing A.S.M.'s functioning in acquiring and using information, and made findings that are supported by substantial evidence. As such, there is no reversible error as to this issue.

**2.    Attending and Completing Tasks**

At the third step of the analysis, ALJ Upshall found that A.S.M. had a less than marked limitation in the domain of attending and completing tasks. (Tr. 24-25.) Plaintiff argues that the ALJ's finding is contrary to substantial evidence, and contrary to law because the ALJ engaged in picking and choosing from the evidence. (Doc. 26 at 11-13.) Plaintiff cites to certain teacher questionnaire ratings that indicated serious and very serious problems in this domain, to evidence that A.S.M. had poor study skills, and to A.S.M.'s IEP's that recommended accommodations for, *inter alia*, repeated directions and instructional content. (*Id.*)

The Commissioner contends that the ALJ recognized Plaintiff's reports about and the Teacher Questionnaires regarding A.S.M.'s problems in this area, and that the ALJ properly relied on the State agency opinion evidence, and teacher reports, which indicated mostly slight or obvious problems in this domain. (Doc. 28 at 11.) The Commissioner further contends that

Plaintiff's claims that the ALJ should have instead found a marked limitation in this domain amounts to asking the Court to re-weigh the evidence.  (*Id.*)

The functional domain of "attending and completing tasks" considers how well a child is able to focus and maintain attention, and how well she begins, carries through, and finishes activities, including the pace at which she performs activities and the ease with which she changes them.  20 C.F.R. § 416.926a(h).

> Attention involves regulating your levels of alertness and initiating and maintaining concentration.  It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance.  This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed.  It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequent to finish it.

20 C.F.R. § 416.926a(h)(1)(i).  The regulations provide the following age descriptor for this domain:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments.  You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments).  You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate.  You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores.  You should also be able to complete a transition task (*e.g.,* be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926(h)(2)(iv).  Examples of limited functioning in attending and completing tasks include:

> (i)      You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.
>
> (ii)     You are slow to focus on, or fail to complete activities of interest to you, *e.g,* games or art projects.

(iii)     You repeatedly become sidetracked from your activities or you frequently interrupt others.

(iv)     You are easily frustrated and give up on tasks, including ones you are capable of completing.

(v)     You require extra supervision to keep you engaged in an activity.

20 C.F.R. § 416.926a(h)(3)(i)-(v).

The Court finds that the ALJ properly considered all of the evidence and regulatory standards in finding that A.S.M. has a less than marked limitation in attending and completing tasks, and that his finding is supported by substantial evidence. *See* 20 C.F.R. § 416.924a; 20 C.F.R. § 416.926a. In support of his finding, the ALJ discussed that Dr. Kaufman reported, during his December 2013 evaluation, that A.S.M. showed no outward signs of impulsivity, hyperactivity or restlessness during the evaluation. (Tr. 20.) The record supports this finding. (Tr. 547.) The ALJ discussed that during A.S.M.'s 2015 standardized testing, she was observed to have a moderately long attention span, was not easily distracted while working on tasks, and was persistent throughout the evaluation. (Tr. 20.) The record supports this finding. (Tr. 681.) The record also supports that during her 2012 standardized testing, A.S.M. was similarly observed to be cooperative and completed all tasks presented to her without complaint. (Tr. 358.)

As for medical source evidence, the ALJ discussed that the State agency consultants initially opined on April 11, 2013, that A.S.M. had no limitation in this domain, but that at reconsideration the State agency consultants assessed she had a less than marked limitation based on Mr. Banegas' Teacher Questionnaire that indicated two serious problems and one very serious problem out of the 13 activities he rated in this domain. (Tr. 20, 80.) The ALJ reasoned that because A.S.M.'s fifth grade teacher had stated A.S.M. always had some trouble paying attention

and following spoken instructions, there was additional evidence to support the State agency consultant reconsideration opinion that A.S.M. had a less than marked limitation, as opposed to no limitation, in this domain. (Tr. 20-21.) The record supports this finding. (Tr. 692.)

The ALJ discussed Plaintiff's testimony and reported functional activity concerning A.S.M.'s problems in this domain. (Tr. 24.) He noted that Plaintiff reported that A.S.M. does not finish what she starts, does not work on arts and crafts projects, and does not complete her homework.[28] (*Id.*) He also noted, however, that Plaintiff testified that A.S.M. cleans her room, likes to help around the house, plays basketball, and plays games on her phone. (Tr. 24.) The record supports these findings. (Tr. 46-47, 59, 223.)

The ALJ discussed reports from A.S.M.'s school related to this domain. (Tr. 24-25.) He discussed that report cards had indicated A.S.M. exhibited satisfactory performance with respect to being a self-directed learner. (Tr. 24.) The record supports this finding. (Tr. 253, 307.) The record also supports that A.S.M.'s third grade teacher reported that A.S.M. participated well in class and used her time wisely. (Tr. 228.) As for the Teacher Questionnaires, the ALJ discussed and compared the domain ratings of A.S.M.'s teachers from 2013 and from 2016 (Tr. 24-25), and concluded they showed that A.S.M. primarily had no more than obvious limitations in attending and completing tasks, which he found was inconsistent with a marked limitation. (Tr. 20.) The ALJ stated that

> [a]side from Mr. Bengas [sic] and Mr. Banks, the claimant's teachers found no more than obvious limitations in attending and completing tasks. Indeed, the teachers' questionnaires reflect multiple slight or even no limitation in a number of related areas. Even Mr. Bengas [sic] also found primarily less than serious limitations in attending and completing tasks. As such, these teachers' questionnaires are largely consistent with each other in showing that the claimant has significant abilities in this domain and are given great weight. Indeed, as

---

[28] In Plaintiff's November 28, 2012, Function Report, she indicated that A.S.M. does complete her homework. (Tr. 164.)

stated above, the teachers had longitudinally-significant opportunities to observe the claimant.

(Tr. 25.)  The record supports this finding.[29]  (Tr. 176, 229, 318, 326, 334.)

Plaintiff essentially asks this Court to reweigh the evidence, which it cannot do.  *See Oldham,* 509 F.3d at 1257-58.  Here, the ALJ demonstrated he considered all the evidence.  *Clifton,* 79 F.3d at 1009-10.  Further, the ALJ relied on much of the evidence Plaintiff cited to determine that the evidence supported a less than marked limitation.[30]  To that end, the ALJ did not engage in picking and choosing as argued, but considered all of the evidence as he was required to do.  Because the Court finds that the ALJ's decision is supported by substantial evidence, and because Plaintiff's argument goes to the weight of the evidence and not its sufficiency, the Court will not displace the ALJ's decision.

For the foregoing reasons, the Court finds that the ALJ considered and discussed the evidence for childhood disability as required, considered the regulatory standards for assessing A.S.M.'s functioning in attending and completing tasks, and made findings that are supported by substantial evidence.  As such, there is no reversible error as to this issue.

### 3.      Health and Physical Well-Being

At the third step of the analysis, ALJ Upshall found that A.S.M. had a less than marked limitation in the domain of health and physical well-being. (Tr. 29.)  Plaintiff argues that because

---

[29] Five teachers completed Teacher Questionnaires – two in 2013 and three in 2016.  (Tr. 176, 229, 318, 326, 334.)  The teachers were asked to rate A.S.M.'s functioning in 13 different activities related to attending and completing tasks.  Although their ratings varied slightly for the respective activities, of the 65 cumulative teacher ratings (5 x 13 = 65), there were 7 blank ratings, 15 no problem ratings, 19 slight problem ratings, 19 obvious problem ratings, 4 serious problem ratings, and 1 very serious problem rating.  (Tr. 176, 229, 318, 326, 334.)

[30] Plaintiff cited A.S.M.'s IEPs to support that A.S.M. required additional time to complete work and that instructions and directions had to be repeated to support that A.S.M. had marked limitation in this domain.  (Doc. 26 at 14-15.)  The ALJ did not discuss this evidence in relationship to his assessment in this domain.  However, the IEP recommendations Plaintiff cited sought accommodations based on A.S.M.'s learning disabilities and struggles with processing information, and not on her ability to attend and complete tasks.  (Tr. 288-90, 400-02, 540-42, 686, 707-09.)

A.S.M.'s irregular heartbeat is severe enough to "require" ablation, the ALJ erred in finding that A.S.M.'s limitation was less than marked. (Doc. 26 at 15-19.) Plaintiff also argues that the ALJ "played doctor" because he relied on treatment notes that indicated A.S.M. had a structurally normal heart with normal cardiac function, and that she did not have any "actual symptoms related to tachycardia" in 2013, to determine A.S.M. had a less than marked limitation in this domain. (*Id.* at 18-19.) Finally, Plaintiff argues that the ALJ improperly relied on the State agency opinion evidence because their opinions were formed before A.S.M.'s cardiologist determined that she "required" the ablation procedure. (*Id.* at 18.)

The Commissioner contends that the ALJ properly discussed A.S.M.'s treatment history related to her heart condition, and correctly noted that Dr. Schuster indicated she was clinically stable, required no cardiology-related limitations, attended regular physical education classes, had no unusual degree of school absences related to her condition. (Doc. 28 at 11-12.) The Commissioner also contends that the ALJ tempered the State agency consultant assessments, who found A.S.M. had no limitations in this domain, and instead determined that she had a less than marked limitation. (*Id.* at 12.)

The functional domain of "health and physical well-being" considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on your functioning. 20 C.F.R. § 926a(l).

> (1)  A physical or mental disorder may have physical effects that vary in kind and intensity, and may make it difficult for you to perform your activities independently or effectively. You may experience problems such as generalized weakness, dizziness, shortness of breath, reduced stamina, fatigue, psychomotor retardation, allergic reactions, recurrent infection, poor growth, bladder or bowel incontinence, or local or generalized pain.

> (2)  In addition, the medications you take (*e.g.,* for asthma or depression) or the treatments you receive (*e.g.,* chemotherapy or multiple surgeries) may have physical effects that also limit your performance of activities.

(3)     Your illness may be chronic with stable symptoms, or episodic with periods of worsening and improvement.  We will consider how you function during periods of worsening and how often and for how long these periods occur.  You may be medically fragile and need intensive medical care to maintain your level of health and physical well-being.  In any case, as a result of the illness itself, the medications or treatment you receive, or both, you may experience physical effects that interfere with your functioning in any or all of your activities.

20 C.F.R. § 926a(l)(1)-(3).  Examples of limitations in health and physical well-being include:

(i)     You have generalized symptoms, such as weakness, dizziness, agitation (*e.g.,* excitability), lethargy (*e.g.,* fatigue or loss of energy or stamina), or psychomotor retardation because of your impairment(s).

(ii)    You have somatic complaints related to your impairments (*e.g.,* seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches, or insomnia).

(iii)   You have limitations in your physical functioning because of your treatment (*e.g.,* chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments).

(iv)    You have exacerbations from one impairment or a combination of impairments that interfere with your physical functioning.

(v)     You are medically fragile and need intensive medical care to maintain your level of health and physical well-being.

20 C.F.R. § 926a(l)(4)(i)-(v).

The Court finds that the ALJ properly considered all of the evidence and regulatory standards in finding that A.S.M. has a less than marked limitation in her health and well-being, and that his finding is supported by substantial evidence.  *See* 20 C.F.R. § 416.924a; 20 C.F.R. § 416.926a.  In support of his assessment, the ALJ stated as follows:

As discussed above, the claimant has supraventricular tachycardia, for which she needs medication and periodic follow up visits.  Moreover, she was recommended a radiofrequency ablation procedure, which she may have to undergo in the future.  However, her cardiologist's treatment notes consistently show that she is generally asymptomatic.  Indeed, as stated above, she is in regular physical

> education classes and does not have an unusual degree of school absenteeism. Even Dr. Schuster has not imposed any cardiology-related limitations. As such, giving the claimant the benefit of the doubt, the undersigned finds that she has less than marked limitations in health and physical well-being.

(Tr. 29.) Elsewhere in his determination, the ALJ thoroughly discussed Dr. Schuster's treatment notes, and cited several of his treatment notes that indicated A.S.M. did not actually feel her irregular heartbeat, that it did not affect her, and that she was essentially asymptomatic. (Tr. 19.) The record supports these findings. (Tr. 469.) The ALJ cited test results that demonstrated A.S.M. had a structurally normal heart with normal cardiac function. (Tr. 19.) The record supports this finding. (Tr. 467, 664.) The ALJ also noted that A.S.M.'s mother reported that A.S.M. was doing well and did not report any symptoms related to her tachycardia. (Tr. 19.) The record supports this finding. (Tr. 466, 470, 472, 601, 629, 664, 670.) Finally, the ALJ noted that Dr. Schuster had never imposed any cardiovascular restrictions. (Tr. 19.) The record supports this finding. (Tr. 467, 471, 473, 494, 630, 665, 671.) The record also supports that A.S.M.'s teachers indicated that A.S.M. plays, rides her bike, plays basketball, enjoys playing outside, and keeps active. (Tr. 283, 394, 535, 700.)

Again, Plaintiff essentially asks this Court to reweigh the evidence, which it cannot do. *See Oldham,* 509 F.3d at 1257-58. Here, the ALJ demonstrated he considered all the evidence. *Clifton,* 79 F.3d at 1009-10. Additionally, the evidence upon which Plaintiff relies to dispute the ALJ's findings is mischaracterized. For example, Plaintiff repeatedly argued that Dr. Schuster determined that A.S.M. "required" the ablation procedure for her irregular heartbeat. (Doc. 26 at 18-19.) However, the record clearly demonstrates the procedure was recommended, and that when A.S.M.'s parents decided to postpone the ablation and continue on medicinal therapy, Dr. Schuster noted that an absolute indication for the procedure would be "decreased cardiac function," which was implicitly not the case here given his instructions to continue A.S.M. on

medication and to follow up every six months.  (Tr. 630, 665, 671.)  Plaintiff also argues that the ALJ "played doctor" because he noted that despite A.S.M.'s irregular heartbeat, and Dr. Schuster's recommendation for the ablation procedure, that Dr. Schuster's echocardiogram findings revealed that A.S.M. had a structurally normal heart with normal cardiac function. (Doc. 26 at 18-19.)  However, the ALJ's recitation of the echocardiogram evidence is almost verbatim what Dr. Schuster's treatment notes indicated; *i.e.,* A.S.M. had a structurally normal heart with normal cardiac function.  (Tr. 467, 664.)  Finally, the ALJ did not rely on the State agency opinion evidence, as Plaintiff argues.  (Doc. 26 at 18.)  Instead, he tempered their findings of no limitations in this area to assess that A.S.M. had a less than marked limitation in light of Dr. Schuster's recommendation for an ablation procedure.[31]  (Tr. 20.)  Because the Court finds that the ALJ's decision is supported by substantial evidence, and because Plaintiff's argument goes to the weight of the evidence and not its sufficiency, the Court will not displace the ALJ's decision.

For the foregoing reasons, the Court finds that the ALJ considered and discussed the evidence for childhood disability as required, considered the regulatory standards for assessing A.S.M.'s functioning in attending and completing tasks, and made findings that are supported by substantial evidence.  As such, there is no reversible error as to this issue.

### 4.  The ALJ Properly Evaluated Joann Marie Ray, D.O.'s Statement

The ALJ accorded Dr. Ray's statement - that she agreed with Plaintiff's decision to seek SSI benefits - little weight.  (Tr. 21.)  He explained that the statement was vague and did not address A.S.M.'s abilities in terms of the relevant functional domains.  (*Id.*)  He further

---

[31] *See generally Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (finding that an ALJ does not commit reversible error by electing to temper findings for the claimant's benefit).

explained that to the extent Dr. Ray was suggesting A.S.M. had disabling limitations, her assessment was inconsistent with the State agency consultants, and the information contained in the Teacher Questionnaires, which reflected less than a marked limitation in all domains except acquiring and using information. (*Id.*) Plaintiff argues (1) that the ALJ only applied one of the relevant regulatory factors in evaluating and weighing Dr. Ray's statement; (2) that the ALJ improperly relied on the State agency opinions because nonexamining opinions are entitled to the least weight of all; and (3) that the Teacher Questionnaires supported extreme and marked limitations making Dr. Ray's statement consistent with the evidence. (Doc. 26 at 20.)

The Commissioner contends that Dr. Ray's statement is not a true medical opinion, but a statement on an issue reserved to the Commissioner. (Doc. 28 at 13.) The Commissioner also contends that the ALJ appropriately determined that Dr. Ray's statement was not well supported or consistent with other evidence in the record. (*Id.*)

When properly rejecting a treating physician's opinion, an ALJ must follow two steps. *Langley*, 373 F.3d at 1119. First, the ALJ must first determine whether the opinion qualifies for "controlling weight." *Id.* To do so, the ALJ must consider whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* If the answer is "no," the inquiry ends. *Id.* If the opinion is well supported, the ALJ must then determine if it is consistent with other substantial evidence in the record. *Id.* If the opinion is deficient in either of these respects, the opinion is not entitled to controlling weight. *Id.* However, even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed using the relevant regulatory factors. *Id.*

As an initial matter, Dr. Ray's statement is not a medical opinion.

Medical opinions are statements from an acceptable medical source that reflect judgments about the nature and severity of [a claimant's] impairments, including

42

> [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions.

20 C.F.R. 416.927(a)(1). As such, Plaintiff's argument that the ALJ failed to properly evaluate her statement using all of the regulatory factors is misplaced. That said, the ALJ did, in fact, evaluate Dr. Ray's statement based on certain of the regulatory factors for weighing medical opinions, and concluded that it was vague, and not supported or consistent with the record as a whole. (Tr. 21.) These are valid reasons for discounting a medical source opinion. *See* 20 C.F.R. 416.927(c)(3) (explaining that more weight will be accorded to medical opinion evidence that is better explained); *see also* 20 C.F.R. 416.927(c)(4) (explaining that more weight will be accorded to medical opinion evidence that is consistent with the record as a whole); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (holding that it is not necessary for the ALJ to address each regulatory factor expressly or at length provided that the ALJ offers good reasons in his opinion for the weight he accorded to a medical opinion). Additionally, the ALJ properly considered the medical source evidence in the record as he was required to do, and there were no treating source opinions regarding A.S.M.'s functional limitations in the six domains of functioning. 20 C.F.R. § 416.924a(a)(iii) and § 416.927(c). Thus, to the extent the ALJ relied on State agency consultant opinion evidence, he did not ignore or displace treating physician medical source evidence in doing so. Finally, the Court has already found that the ALJ's findings as to A.S.M.'s limitations in the functional domains at issue are supported by substantial evidence. *See* Section III.B.1-3., *supra*. As such, Plaintiff's argument that Dr. Ray's statement, to the extent it suggests disabling limitations, is supported by the Teacher Questionnaires, necessarily fails.[32]

---

[32] The ALJ does not specifically address Dr. Ray's February 8, 2016, treatment note. However, Dr. Ray similarly did not provide any functional assessment related to A.S.M.'s limitations in the relevant domains, but instead supported Plaintiff's decision to seek SSI benefits. (Tr. 727-28.) Further, the IEP test results Dr. Ray reported

For the foregoing reasons, the Court finds that the ALJ properly evaluated Dr. Ray's statement and that his findings are supported by substantial evidence. As such, there is no reversible error as to this issue.

**5.**     **The ALJ Properly Applied the Regulatory Standards in Assessing A.S.M.'s Functional Equivalence**

Plaintiff argues that the ALJ failed to compare A.S.M. to non-disabled children and neglected to explain why the specific findings of teachers describing the various and numerous limitations did not result in marked or extreme limitations. (Doc. 26 at 20-21.) The Commissioner contends that Plaintiff's argument amounts to re-hashing her other arguments. (Doc. 28 at 13-14.)

SSR 09-01p states in pertinent part that

> [w]e always evaluate the "whole child" when we make a finding regarding functional equivalence, unless we can make a fully favorable determination or decision without having to do so. The functional equivalence rules require us to begin by considering how the child functions every day and in all settings compared to other children the same age who do not have impairments.

SSR 09-1p, 2009 WL 396031, at *2. Here, the ALJ stated that

> [a]s provided in 20 CFR 416.926a(b) and (c) and explained in 09-1p, the undersigned has evaluated the "whole child" in making findings regarding functional equivalence. The undersigned has first evaluated how the child functions in all settings and at all times, as compared to other children the same age who do not have impairments. The undersigned has also assessed the interactive and cumulative effects of all of the claimant's medically determinable impairment(s), including any impairments that are not "severe" in all of the affected domains. In evaluating the claimant's limitations, the undersigned has considered the type, extent, and frequency of help the claimant needs to function.

(Tr. 18.) Where, as here, the ALJ explicitly indicated he considered all the evidence in accordance with the applicable regulatory standards, the Court's practice is to take the ALJ "at [his] word." *Flaherty v. Astrue,* 515 F.3d 1067, 1071 (10th Cir. 2007) (citing *Hackett v. Barnhart,*

---

therein are incomplete and do not provide a complete summary of A.S.M.'s current levels of academic achievement and functional performance. (*See* Tr. 696-703); *see also* fns. 9, 10 and 11, *supra.*

395 F.3d 1168, 1173 (10th Cir. 2005)).  Having found that the ALJ's discussion of the evidence and the reasons for his conclusions are supported by substantial evidence, the Court has every reason to abide by this well-established principle here.

For the foregoing reasons, the Court finds that the ALJ considered and discussed the evidence for childhood disability as required, and properly applied the regulatory standards in assessing A.S.M.'s functional equivalence in the domains at issue.  For these reasons, there is no reversible error as to this issue.

## IV.  <u>Conclusion</u>

Plaintiff's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing, With Supporting Memorandum (Doc. 26) is **DENIED.**

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**